David Orozco (CA Bar No. 220732)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Ste. 950
Los Angeles, CA 90067-6029
Telephone: (310) 310-3100
Facsimile: (310) 789-3150
E-Mail:     dorozco@susmangodfrey.com

Parker C. Folse (*pro hac vice*)
Brooke A. M. Taylor (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Ave, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
E-Mail:     pfolse@susmangodfrey.com
            btaylor@susmangodfrey.com

*Counsel for T-Mobile U.S.A., Inc.*

Edward A. Friedman (*pro hac vice*)
Daniel B. Rapport (*pro hac vice*)
Hallie B. Levin (*pro hac vice*)
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250
E-Mail: efriedman@fklaw.com
        drapport@fklaw.com
        hlevin@fklaw.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION<br><br>This Document Relates to Case C 3:11-02591 SI | Master File No. C M:07-01827 SI<br>Individual Case No. C 3:11-02591 SI<br>MDL NO. 1827 |
| T-MOBILE U.S.A., INC.,<br><br>            Plaintiff,<br><br>v.<br><br>AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC; CHI MEI CORPORATION; CHIMEI INNOLUX CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY; TATUNG COMPANY | **AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

OF AMERICA, INC.; SEIKO EPSON
CORPORATION; EPSON IMAGING
DEVICES CORPORATION; EPSON
ELECTRONICS AMERICA, INC.;
HANNSTAR DISPLAY CORPORATION;
HITACHI, LTD.; HITACHI DISPLAYS,
LTD.; HITACHI ELECTRONIC DISPLAYS
(USA), INC.; LG DISPLAY CO. LTD.; LG
DISPLAY AMERICA, INC.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
SEMICONDUCTOR, INC.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
AMERICA, INC.; SANYO CONSUMER
ELECTRONICS, LTD.; SHARP
CORPORATION; SHARP ELECTRONICS
CORPORATION; TOSHIBA
CORPORATION; TOSHIBA AMERICA
ELECTRONICS COMPONENTS, INC.;
TOSHIBA MOBILE DISPLAY
TECHNOLOGY CO., LTD.; TOSHIBA
AMERICA INFORMATION SYSTEMS, INC.,

Defendants.

Plaintiff T-Mobile U.S.A., Inc. ("T-Mobile," and also as defined subsequently herein) for its Complaint against all defendants named herein, hereby alleges as follows:

## I.      INTRODUCTION

1.      T-Mobile sells mobile wireless handsets and wireless telecommunications services to millions of customers throughout the United States.  From 1996 to 2006 ("the Conspiracy Period," and also as subsequently defined herein), T-Mobile purchased billions of dollars worth of mobile wireless handsets in the United States.  The majority of mobile wireless handsets T-Mobile purchased during the Conspiracy Period contained liquid crystal display panels ("LCD Panels," and also as subsequently defined herein).

2.      During the Conspiracy Period, through hundreds of in-person meetings, telephone calls, emails, and other communications in the United States and abroad, defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels, including LCD Panels included in mobile wireless handsets sold to T-Mobile.  Because the U.S. market for LCD Panels and products containing those panels has always been one of the largest and most-profitable markets for defendants and their co-conspirators, defendants purposely fixed prices to unlawfully maintain and increase their profits from sales to customers in the U.S.

3.      During the Conspiracy Period, LCD Panels used in hand-held devices such as mobile wireless handsets included different technologies:  thin film transistor panels ("TFT-LCD Panels") and super-twist nematic panels ("STN-LCD Panels").   STN-LCD Panels included both color super-twist nematic ("CSTN-LCD Panels") panels, and monochrome super-twist nematic ("MSTN- LCD Panels") panels.  Defendants' conspiracy involved both TFT-LCD Panels and STN-LCD Panels; defendants engaged in meetings, discussions and exchanges of competitive price information regarding both TFT-LCD Panels and STN-LCD Panels; and defendants agreed to set prices and restrict output of both TFT-LCD Panels and STN-LCD Panels.  REDACTED

4.      T-Mobile, as one of the largest wireless telecommunications providers in the U.S. and one of the most significant purchasers of mobile wireless handsets, increased consumer demand in the U.S. for mobile wireless handsets during the Conspiracy Period and thus demand for LCD Panels manufactured by defendants.  T-Mobile served as one of the principal distribution channels for mobile wireless handsets for the U.S. market.

Defendants knew that T-Mobile was among the most important purchasers of mobile wireless handsets containing the LCD Panels they manufactured, and that the LCD Panels they price-fixed would end up in mobile wireless handsets purchased by T-Mobile in the U.S.  Defendants were thus aware that T-Mobile would be affected by their conspiracy to fix the price of LCD Panels, and would suffer injury in the U.S. when it purchased handsets containing defendants' LCD Panels.

5.     At least seven LCD Panel manufacturers have admitted in criminal proceedings to participating in this conspiracy and carrying out this conspiracy in the United States and California:  defendants LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Chi Mei Optoelectronics Corporation and HannStar Display Corporation. On or about November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.   On or about December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy.  And on or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

6.     Defendants engaged in conspiratorial conduct both within and outside the United States.   Defendants' conduct in the United States was centered in California. Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa

Picture Tubes, Ltd., and Epson Imaging Devices Corporation all admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California.  Each agreed that:  "Acts in furtherance of this conspiracy were carried out within the Northern District of California.  TFT- LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District."  Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4 (N.D. Cal.).  Defendant LG Display America, Inc., which admitted to participating in the conspiracy, maintains its principal place of business in San Jose, California.  Similarly, defendants Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, and Chi Mei Optoelectronics Corporation, which also admitted to participating in the conspiracy, used California corporations with principal places of business in Long Beach, California (defendants Tatung Company of America, Inc., Epson Electronics America, Inc., and Chi Mei Optoelectronics USA, Inc. respectively), as their sales agents in the United States for LCD Products (as defined subsequently herein) containing LCD Panels that were affected by the conspiracy.  Many of the other defendants also maintained offices and operations in California during the Conspiracy Period, including AU Optronics Corporation America, Inc., Nexgen Mediatech USA, Inc., Samsung Semiconductor, Inc., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc.

7.     Defendants engaged in and implemented their conspiracy in the U.S. through the offices they maintained in California.  Defendants' employees in their California offices engaged in communications and meetings with other defendants to exchange price and supply information and reach agreements regarding LCD Panel prices to be charged to their

customers in the U.S. and elsewhere.  Defendants' employees in California also received information from their counterparts elsewhere regarding the substance of defendants' agreements with respect to LCD Panel prices and supply, and were instructed to use this information in the course of price negotiations with customers in the United States. Defendants' California offices were thus the means through which they implemented their conspiracy in the United States.  Defendants, including Samsung (as subsequently defined herein), used their employees in their California offices to implement their price fixing agreements with respect to small LCD Panels used in mobile wireless handsets.

8.     As a result of defendants' conspiracy to fix the price of LCD Panels, the prices of handsets containing LCD Panels purchased by T-Mobile were artificially inflated. Defendants' conspiracy also artificially inflated the price of LCD Panels incorporated into the LCD Products T-Mobile purchased for its own internal use during the Conspiracy Period, such as desktop computer monitors and notebook computers, and therefore artificially inflated the price of such LCD Products.  T-Mobile thus suffered damages as a result of defendants' conspiracy, and brings this action to recover the overcharges paid for the mobile wireless handsets and other LCD Products it purchased during the Conspiracy Period.

9.     T-Mobile brings this action seeking injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover damages under Section 4 of the Clayton Act, and under California and New York law, as well as to recover the costs of suit, including reasonable attorneys fees, for the injuries that T-Mobile suffered as a result of defendants' conspiracy to fix, raise, maintain and stabilize the prices of LCD Panels.

## II.     JURISDICTION AND VENUE

10.     T-Mobile brings this action under Section 1 of the Sherman Act, 15 U.S.C. §
1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages for its direct
purchases of LCD Panels from certain defendants.  In addition, T-Mobile brings this action
under Section 1 of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. § 26, to
obtain injunctive relief against all defendants.

11.     T-Mobile also brings this action pursuant to Section 16750(a) of the
California Business and Professions Code (the "Cartwright Act") and Section 340 *et seq.* of
the New York General Business Law for injunctive relief and treble damages sustained by
T-Mobile as a result of its purchases of mobile wireless handsets, desktop monitors,
notebook computers, and other LCD Products at artificially-inflated prices as a result of
defendants' conspiracy to fix the price of LCD Panels.  In addition, T-Mobile brings this
action pursuant to Sections 17203 and 17204 of the California Business and Professions
Code, to obtain restitution from and an injunction against defendants due to their violations
of Section 17200 *et seq.* of the California Business and Professions Code (the "Unfair
Competition Act").

12.     Because T-Mobile brings this action pursuant to Section 4 of the Clayton Act
which gives the federal courts jurisdiction over private antitrust enforcement actions like
this one, this Court has federal subject matter jurisdiction under 28 U.S.C. §§ 1331 and
1337.   As to T-Mobile's claims under the antitrust, unfair competition and consumer
protection laws of the States of California and New York, jurisdiction exists pursuant to 28
U.S.C. § 1367.

13.     The U.S. District Court for the Western District of Washington and this Court both have personal jurisdiction over the defendants because each defendant is either an alien corporation, transacts business in the Western District of Washington and this District, or is otherwise formed in the Western District of Washington or this District, and because a substantial portion of the acts, events or omissions giving rise to these claims occurred in the State of Washington and the Western District of Washington, this State and this District, as well as many others.  In fact, defendants conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the States of Washington and California.  Defendants' products are sold in the flow of interstate commerce, and defendants' activities have had a direct, substantial and reasonably foreseeable effect on such commerce.  Defendants and their co-conspirators knew that price-fixed LCD Panels and LCD Products containing price-fixed LCD Panels would be sold and shipped into the Western District of Washington and this District.

14.     Venue is proper in this District and, for purposes of trial, in the Western District of Washington under 15 U.S.C. § 22 and 28 U.S.C. § 1391.

15.     Venue is also proper in this District for purposes of discovery because this action is related to the case captioned *In re TFT-LCD (Flat Panel) Antitrust Litigation*, Case No. M:07-cv-1827 SI, pending in this District, which was assigned to the San Francisco division, Judge Susan Illston presiding.  This action concerns substantially the same parties, transactions and events as Case No. M:07-cv-1827 SI insofar as it involves a suit for damages and injunctive relief arising out of defendants' conspiracy to fix the price of LCD Panels in violation of the Sherman Act and the laws of California and other states.

16.     Having been consolidated with the cases pending in MDL No. 1827 in this District for pretrial purposes, this case should be returned to the Western District of Washington for trial.

**III.     DEFINITIONS**

17.     Liquid crystal display panels use glass plates and a liquid crystal compound to electronically display an image.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."   The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image.  As used herein, "LCD Panel" refers to both liquid crystal display panels and modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a mobile wireless handset, television, computer monitor, or other product.

18.     During the Conspiracy Period, LCD Panels used in hand-held devices included three different technologies:  TFT-LCD Panels, CSTN panels and MSTN panels (together, with CSTN Panels, "STN-LCD Panels").   The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products, including mobile wireless handsets.

19.     As used herein, the term "LCD Products" means any product containing an LCD Panel, including, without limitation, mobile wireless handsets (including voice, data, and combination voice and data devices), computer monitors, notebook and laptop computers, and televisions.

20.     As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

21.     As used herein, the term "Conspiracy Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

## IV.     THE PARTIES

### A.     Plaintiff T-Mobile

22.     T-Mobile (formerly known as Western PCS Corporation and VoiceStream Wireless Corporation) is a Delaware corporation with its principal place of business at Bellevue, Washington. T-Mobile is one of the largest national providers of mobile wireless telecommunications services in the United States, with over 33 million subscribers and a wireless network providing nationwide wireless coverage. During the Conspiracy Period, T-Mobile purchased mobile wireless handsets and other LCD Products containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others. As a result of defendants' conspiracy, T-Mobile has been injured in its business and property because the prices it paid for such LCD Products were artificially inflated by defendants' conspiracy.

23.     During and after the Conspiracy Period, T-Mobile acquired or received the stock of companies that also purchased mobile wireless handsets and other LCD Products containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others. As a result of defendants' conspiracy, these companies were injured in their business and property because the prices they paid for mobile wireless handsets and other LCD Products were artificially inflated by defendants' conspiracy. By acquiring or receiving a contribution of the stock of companies that purchased mobile wireless handsets and other LCD Products containing LCD Panels, T-Mobile obtained all claims and rights

under federal and state laws to recover any overcharges suffered by those companies.  As used herein, "T-Mobile" refers to T-Mobile U.S.A., Inc., as well as any company that purchased mobile wireless handsets during the Conspiracy Period whose stock was later acquired or obtained by T-Mobile U.S.A., Inc.

24.     During the Conspiracy Period, T-Mobile purchased billions of dollars of mobile wireless handsets that contained LCD Panels manufactured by defendants. Defendants' conspiracy artificially inflated the prices of the LCD Panels contained in these mobile wireless handsets.  T-Mobile suffered injury caused by the conspiracy when it purchased mobile wireless handsets from defendants, their affiliates and other manufacturers of mobile wireless handsets.

25.     Throughout the Conspiracy Period, T-Mobile maintained, in each of the states where it operated company-owned retail stores and sold to authorized sales agents, inventories of mobile wireless handsets that it purchased and received from the handset vendors at its distribution centers.

26.     During the Conspiracy Period, T-Mobile conducted a substantial volume of business in both California and New York.  T-Mobile provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in California and New York through its corporate-owned retail stores, through independent retailers located in California and New York, and through its website on the Internet. T-Mobile also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in California and New York through both its own sales force and independent sales agents.  In addition, T-Mobile maintained in

both California and New York inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others.

27.    During the Conspiracy Period, T-Mobile purchased LCD Products for its own use (including notebook computers and desktop monitors) containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

28.    During the Conspiracy Period, all of T-Mobile's negotiations for the purchase of mobile wireless handsets and other LCD Products took place in the United States and were controlled by procurement organizations based in the United States.  In addition, all T-Mobile purchase orders for mobile wireless handsets and other LCD Products were issued from the United States and all invoices were sent to T-Mobile in the United States.  Moreover, all of the contracts T-Mobile entered into for the purchase of mobile wireless handsets and other LCD Products were with either providers based in the United States or with the U.S. subsidiaries or affiliates of foreign-based providers. Further, T-Mobile took title to all the mobile wireless handsets and other LCD Products it purchased in the United States.

**B.    Defendants**

**1.    AU Optronics**

29.    Defendant AU Optronics Corporation is one of the world's largest manufacturers of LCD Panels, with its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.  AU Optronics Corporation was formed by the

1985880v1/011730

2001 merger of Unipac Optoelectronics and Acer Display Technology.  AU Optronics Corporation acquired Quanta Display in 2006.

  a.  Unipac Optoelectronics ("Unipac"), a former Taiwanese LCD Panel manufacturer and an affiliate of United Microelectronics Corp., was founded in November 1990.  Unipac later merged with Acer Display Technology Inc. ("ADT") to form defendant AU Optronics Corporation in September 2001;

  b.  ADT, a former Taiwanese LCD Panel manufacturer and an affiliate of the Acer Group, was founded in August 1996.  Acer later merged with Unipac to form defendant AU Optronics in September 2001.  ADT and Unipac shared equal partnership in AU Optronics Corporation.  ADT Chairman K.Y. (Kuen-Yao) Lee had continued in his role as Chairman and CEO of AU Optronics Corporation during the Conspiracy Period;

  c.  Quanta Display Inc. ("QDI"), a former Taiwanese LCD Panel manufacturer and a subsidiary of Quanta Computer Inc., was founded in July 1999.  QDI was absorbed into defendant AU Optronics Corporation through merger in October 2006, with the later assuming all rights and obligations of QDI.

30.  Defendant AU Optronics Corporation America, Inc. is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation, with its corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and Cupertino, California.  During the Conspiracy Period, said defendant

manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

31.     Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. are referred to collectively herein as "AU Optronics."  The AU Optronics companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant AU Optronics Corporation America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

## 2.     <u>Chi Mei</u>

32.     Defendant Chi Mei Corporation is another of the world's largest manufacturers of LCD Panels, with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

33.     Defendant Chimei Innolux Corporation is another of the largest manufacturers of LCD Panels, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels to customers throughout the United States.

a.     Chimei Innolux Corporation was formed on March 18, 2010 by a three-way merger of Chi Mei Optoelectronics Corp., Innolux Display Corp., and TPO Displays Corp., through exchanges of shares. Innolux, the surviving company of the merger, renamed itself "Chimei Innolux Corporation." TPO Display Corp. and Chi Mei Optoelectronics Corp. were dissolved after the merger.

b.     Prior to the merger Chi Mei Optoelectronics Corporation was a former LCD Panel manufacturer, with its global headquarters at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan. It was a wholly-owned subsidiary of Chi Mei Corporation.

c.     Innolux Display Corp. was a former LCD Panel manufacturer, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan.

d.     Prior to the merger, Chi Mei Optoelectronics Corp. Innolux Display Corp., and TPO Displays Corp. manufactured, marketed, sold and/or distributed LCD Panels to customers throughout the United States.

34.     Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display Technology USA, Inc. is a wholly-owned and controlled subsidiary of Chi Mei Corporation, with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

35. Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd. is a subsidiary of Chi Mei Corporation, with its principal place of business located at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

36. Defendant Nexgen Mediatech, Inc. ("Nexgen") is a wholly-owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St., Jen Te Village Jen Te, Tainan 717 Taiwan. During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation in the United States.

37. Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a wholly-owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East Johnson Drive, City of Industry, California. During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation in the United States.

38. Defendants Chi Mei Corporation, Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA are referred to collectively herein as "Chi Mei." The Chi Mei companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendants Chimei Innolux Corporation (through its predecessor in interest Chi Mei Optoelectronics Corporation), Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA were members of the

conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation.  Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 3.  <u>Chunghwa</u>

39.  Defendant Chunghwa Picture Tubes Ltd. ("CPT") is a leading manufacturer of LCD Panels, with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan.  CPT is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.  CPT's Board of Directors includes representatives from Tatung Company.  The Chairman of CPT, Weishan Lin, is also the Chairman and General Manager of the Tatung Company.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

40.  Defendant Tatung Company is a consolidated consumer electronics and information technology company based in Taiwan.  Its principal place of business is at 22, Sec. 3, Chung-Shan N. Rd., Taipei City 104, Taiwan.  Tatung Company is the parent company of CPT and Tatung Company of America, Inc.  During the Conspiracy Period, Tatung Company manufactured, marketed, sold, and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

41.  Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung

1
2
3
4
5

Company owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.   During the Conspiracy Period, Tatung America sold and distributed LCD Products manufactured by CPT to customers throughout the United States.

6
7
8
9

42.     Defendants CPT, Tatung Company and Tatung America are referred to collectively herein as "Chunghwa."   During the Conspiracy Period, CPT and Tatung America were closely affiliated, commonly owned, controlled and dominated by the Tatung Company, and functioned as a single enterprise and/or alter egos.

10
11
12
13
14

43.     Alternatively, defendants CPT and Tatung America were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Tatung Company.  Tatung Company dominated and controlled Tatung America through its close affiliation and 50% ownership interest.   REDACTED

15
16
17
18
19
20
21
22
23
24
25
26
27

28

1    Tatung Company used its domination and control over both Tatung America and CPT to

2    charge artificially high prices for LCDs and LCD Products.

3                            **4.      Epson**

4        44.      Defendant Seiko Epson Corporation ("Seiko Epson") has its principal place

5    of business at 2-4-1, Nishi-Shinjuku-ku, Tokyo, Japan.   During the Conspiracy Period,

6    Seiko Epson marketed, sold and/or distributed LCD Panels and/or LCD Products throughout

7
8    the United States and elsewhere.

9        45.      Defendant Epson Imaging Devices Corporation ("Epson Japan") has its

10   principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-

11   cho, Minato-ku, Tokyo 105-6104 Japan.   The company was originally formed as a joint

12   venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-

13   owned subsidiary of Seiko Epson Corporation.   Up until December 28, 2006, Epson Japan

14   was known as Sanyo Epson Imaging Devices Corporation.   During the Conspiracy Period,

15   Epson Japan manufactured, marketed, sold and/or distributed LCD Panels and/or LCD

16
17   Products throughout the United States and elsewhere.

18       46.      Defendant Epson Electronics America, Inc. ("Epson America") is a wholly-

19   owned and controlled subsidiary of Seiko Epson Corporation.   Its principal place of business

20   is at 2580 Orchard Parkway, San Jose, California.   During the Conspiracy Period, Epson

21   America sold and distributed LCD Products containing LCD Panels manufactured by Epson

22
23   Japan to customers in the United States.

24       47.      Defendants Seiko Epson, Epson Japan and Epson America are referred to

25   collectively herein as "Epson."   The Epson companies were members of the conspiracy that

26   is the subject of this Complaint by virtue of their participation in the conspiracy through the

27
28

actions of their respective officers, employees, and representatives acting with actual or apparent authority.   Alternatively, defendant Epson America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and LCD Products.

### 5. HannStar

48.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

### 6. Hitachi

49.     Defendant Hitachi, Ltd. is a Japanese company with its headquarters at 6-6 marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

50.     Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3,Chiyoda-ku,Tokyo,101-0022, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

51.     Defendant Hitachi Electronic Devices (USA), Inc., a wholly owned and controlled subsidiary of defendant Hitachi Ltd., with its principal place of business located at 575 Mauldin Road, Greenville, South Carolina 29607.  During the Conspiracy Period,

said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

52.     Defendants Hitachi Displays Ltd., Hitachi America Ltd. and Hitachi Electronic Devices (USA), Inc. are referred to collectively herein as "Hitachi."

### 7.     LG Display

53.     Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd. is a leading manufacturer of LCD Panels and is a joint venture created in 1999 by defendants Royal Philips Electronics NV and LG Electronics, Inc.  LG Display Co., Ltd. maintains offices within this District in San Jose, California and has its principal place of business located at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

54.     Defendant LG Display America, Inc. f/k/a/ LG Philips LCD America, Inc. is located at 150 East Brokaw Rd., San Jose, CA 95112.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

55.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to collectively herein as "LG Display."  Defendants LG Display Co., Ltd. and LG Display America, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display

America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 8.    Philips

56.    Defendant Philips Electronics North America Corporation ("Philips") has its principal place of business at 3000 Minuteman Road, Andover, Massachusetts 01810. Philips is a wholly-owned subsidiary of Philips Holdings USA, Inc., which in turn is a wholly-owned subsidiary of co-conspirator Koninklijke Philips Electronics N.V. ("Royal Philips").   During the Conspiracy Period, Philips manufactured, marketed, sold, and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

57.    Philips' ultimate parent company, Royal Philips, entered into a joint venture with its competitor, LG Electronics, Inc. in 1999 to form LG Philips LCD Co., Ltd., now known as LG Display Co., Ltd.  LG Display Co., Ltd. was one of the leading manufacturers of LCD Panels during the Conspiracy Period.  REDACTED

LG Display has admitted participation in a global conspiracy to fix LCD Panel prices, and Royal Philips,

as a player in that global market and a joint-venture owner of LG Display, participated in the conspiracy through LG Display and through other actions hereinafter alleged.  LG Display and Royal Philips were co-conspirators in the conspiracy, and Philips was the agent and the sales and marketing representative for Royal Philips and its divisions and subsidiaries in the United States.

58.      Philips participated in the conspiracy through the actions of its officers, employees, and representatives acting with actual or apparent authority.  Alternatively, Philips was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of co-conspirator Royal Philips.  Royal Philips dominated or controlled Philips regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels incorporated into LCD Products sold in the United States.

### 9.      Samsung

59.      Defendant Samsung Electronics Co., Ltd. ("Samsung Electronics") is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

60.      Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

61.     Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd., with its principal place of business at 3655 North First Street, San Jose, California 95134.   During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

62.     Defendant Samsung SDI Co., Ltd. has its principal place of business at 673-7 Maetan-dong, Youngton-gu, Suwon, Republic of Korea.   Samsung Electronics holds a controlling interest in Samsung SDI Co., Ltd.  During the Conspiracy Period, said defendant manufactured, marketed, sold, and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

63.     Defendant Samsung SDI America, Inc. is a wholly-owned subsidiary of Samsung SDI Co., Ltd.  Its principal place of business is 3333 Michelin Drive, Suite 700, Irvine, California 92618.   During the Conspiracy Period, said defendant manufactured, marketed, sold, and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

64.     Defendants Samsung SDI Co., Ltd., and Samsung SDI America, Inc. are referred to collectively herein as "Samsung SDI."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant Samsung SDI America, Inc. was a member of the conspiracy as the alter ego or agent of Samsung SDI Co., Ltd. Samsung SDI Co., Ltd. dominated or controlled Samsung SDI America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

1985880v1/011730

65.     On information and belief, Samsung Electronics is the amnesty applicant in the DOJ's investigation of the LCD price-fixing conspiracy.  Samsung Electronics retained Sheppard Mullin Richter & Hampton LLP ("Sheppard Mullin") as counsel with respect to its leniency application as well as the MDL.  Sheppard Mullin, apparently on loan from Samsung Electronics, appeared as counsel for Samsung SDI Co., Ltd. and Samsung SDI America (collectively "Samsung SDI") in the MDL.  Sheppard Mullin continued to represent all of the Samsung-related Defendants in the MDL until recently, when it withdrew as counsel of record for Samsung Electronics, Samsung Electronics America, Inc., and Samsung Semiconductor, Inc.  This sharing of common counsel and later reassignment of Samsung Electronics' primary counsel to Samsung SDI is reflective of the coordinated and common enterprise of the Samsung-related Defendants with respect to the conspiracy alleged herein.

66.     During the Conspiracy Period, Samsung SDI coordinated its conduct and shared confidential competitive information with Samsung Electronics and its subsidiaries and affiliates.  Samsung SDI bought components for its LCDs and LCD Products from likely amnesty applicant and Samsung SDI's largest shareholder, Samsung Electronics, as well as Toshiba and admitted conspirator Hitachi.  Employees of Samsung SDI responsible for marketing and selling LCDs and LCD Products during the Conspiracy Period ignored corporate formalities and held themselves out as employees and agents of Samsung Electronics as well as Samsung SDI.  Employees of the Samsung Defendants who were primarily responsible for sales and marketing to wireless handset manufacturers used and displayed both Samsung Electronics and Samsung SDI email addresses.  Samsung SDI shared booths at LCD-related trade shows with Samsung Electronics, and both companies

emphasized the "synergies" between Samsung SDI and Samsung Electronics in marketing and selling LCDs and LCD Products during the Conspiracy Period.

67.     The net effect of the coordination and overlap of the Samsung Electronics and Samsung SDI's sales and marketing function was to leave purchasers with the impression that their daily dealings were with "Samsung" when it came to considering and purchasing LCDs and LCD Products.

68.     █████████████ REDACTED █████████████

████████████████████████████████████████

████████████████████████████ Samsung SDI is currently being investigated by competition authorities in the European Union, Hungary, Japan, and South Korea for participating in a global conspiracy to fix the prices of CRTs during that same period.

69.     Defendants Samsung Electronics, Samsung Electronics America, Inc., Samsung Semiconductor, Inc., Samsung SDI Co., Ltd., and Samsung SDI America, Inc. are referred to collectively herein as "Samsung."  Defendants Samsung Electronics, Samsung Electronics America, Inc., Samsung Semiconductor, Inc., Samsung SDI Co., Ltd., and Samsung SDI America, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Samsung Electronics America, Inc., Samsung Semiconductor, Inc., Samsung SDI Co., Ltd., and Samsung SDI America, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics.  Samsung Electronics dominated or controlled Samsung Electronics America, Inc., Samsung

1985880v1/011730

Semiconductor, Inc., Samsung SDI Co., Ltd., and Samsung SDI America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 10.    Sanyo

70.    Defendant Sanyo Consumer Electronics Co., Ltd., formerly known as Tottori Sanyo Electric Co. (also known as "Torisan") is a Japanese company with its principal place of business at 101, 7-Chome, Tachikawa-Cho, Tottori City, Tottori, 680-0061, Japan.  Prior to 2004, co-conspirator Sanyo Electric Co., Ltd., owned and operated Sanyo Consumer Electronics Co., Ltd.  In 2004, Seiko Epson Corporation and Sanyo Electric Co., Ltd. (including its subsidiary Sanyo Consumer Electronics Co., Ltd.) formed a joint venture company, Sanyo Epson Imaging Devices Corporation.  This joint venture was formed from a combination of Seiko Epson's D-TFD LCD and STN LCD businesses and Sanyo's LTPS TFT LCD and amorphous silicon TFT LCD businesses.  After the Conspiracy Period, Sanyo Epson Imaging Devices Corporation became Epson Imaging Devices Corporation, also a defendant.    During the Conspiracy Period, Sanyo Consumer Electronics Co., Ltd. manufactured, sold, and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

71.    Defendant Sanyo Consumer Electronics Co., Ltd. is referred to herein as "Sanyo."  It participated in the conspiracy through the actions of its officers, employees, and representatives acting with actual or apparent authority.    During the Conspiracy Period, Sanyo Consumer Electronics Co., Ltd. was closely affiliated, commonly owned, controlled and dominated by co-conspirator Sanyo Electric Co., Ltd. and functioned as a single enterprise and/or alter ego.    Sanyo Consumer Electronics Co., Ltd. is a wholly-owned

subsidiary of Sanyo Electric Co., Ltd., a consolidated consumer electronics and information technology company based in Japan.

### 11.    Sharp

72.    Defendant Sharp Corporation, is located at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.   During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

73.    Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Sharp Corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey, 07430.   During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

74.    Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp."   Defendants Sharp Corporation and Sharp Electronics Corporation were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.   Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation.   Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 12.    Toshiba

75.    Defendant Toshiba Corporation is located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.   During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

76.     Defendant Toshiba Mobile Display Co., Ltd., f/k/a Toshiba Matsushita Display Technology Co., Ltd. is located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.   During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

77.     Toshiba America Electronic Components, Inc. is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation with its corporate headquarters at 19900 MacArthur Blvd., Ste. 400, Irvine, CA 92612.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

78.     Defendant Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc. with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  During the Conspiracy Period, Toshiba America Information Systems, Inc. manufactured, marketed, sold and/or distributed LCD Products in the United States.

79.     Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."   Defendants Toshiba Corporation, Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc.

and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation. Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### C. Co-Conspirators

80. The actions in this Complaint were authorized, ordered, or done by defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

81. Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein. Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products made by its parent company.

82. Various persons and entities participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These co-conspirators are believed to include, without limitation, Fujitsu Display Technologies Corporation, LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies Co., Ltd., NEC Corporation, NEC Electronics America, Inc., NEC LCD Technologies, Ltd., Royal Philips Electronics N.V., IPS Alpha Technology, Ltd., Mitsubishi Electric Corporation, Panasonic Corporation, and Panasonic Corporation of North America.

83. The acts charged in this Complaint have been done by defendants and their co- conspirators, or were authorized, ordered, or done by their respective officers, agents,

employees, or representatives while actively engaged in the management of each defendant's business or affairs.

84.     Each defendant named herein acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein.  Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels made by its parent company.

## V.     THE MARKET FOR LCD PANELS AND LCD PRODUCTS

85.     LCD Panels are utilized in mobile wireless handsets, televisions, computer monitors, notebook computers, digital cameras, and numerous other electronic products.  LCD Panels were the principal form of display screen used in mobile wireless handsets, desktop computer monitors, laptop computers and during the Conspiracy Period.

86.     LCD Panels have no independent utility, and have value only as components of LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computer displays and televisions.  The demand for LCD Panels thus derives directly from the demand for LCD Products.

87.     The market for LCD Panels is enormous, in part because of the extraordinarily high demand for mobile wireless handsets and other LCD Products.  For example, demand for mobile wireless handsets grew exponentially during the Conspiracy Period.  In 1997, worldwide shipments of mobile wireless handsets totaled approximately 100 million units.  This number ballooned to over one billion units by 2006.  This increased demand for mobile wireless handsets drove a similar increase in the demand for LCD Panels during the Conspiracy Period.  Shipments of LCD Panels for mobile wireless handsets grew from approximately 400 million panels in 2001 to over a billion panels in 2006.

1985880v1/011730

88.     The markets for LCD Panels and LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computers and televisions, are inextricably linked and intertwined because the LCD Panel market exists to serve the market for LCD Products.   The markets for LCD Panels and for LCD Products are, for all intents and purposes, inseparable in that one would not exist without the other.

89.     Once an LCD Panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.   LCD Panels are identifiable, discrete physical objects that do not change form or become an indistinguishable part of an LCD Product.   Thus, LCD Panels follow a physical chain from defendants, through manufacturers of LCD Products, to T-Mobile.

90.     During the Conspiracy Period, the demand for LCD Panels by manufacturers of LCD Products was relatively inelastic, because there were no reasonable substitutes for LCD Panels to serve as the visual display for products such as mobile wireless handsets, desktop computer monitors and laptop and notebook computers.   The other principal flat panel display technology, plasma, is too big, consumes too much power and is too fragile to be of any practical application in mobile wireless handsets or laptop or notebook computers. Other competing display technologies, such as OLED displays, were not available during the Conspiracy Period and are only today becoming widely available.   In addition, throughout the Conspiracy Period, defendants controlled the market for LCD Panels. Consequently, during the Conspiracy Period, the handset OEMs and computer OEMs had no choice but to purchase LCD Panels from defendants and others at prices that were artificially inflated, fixed, and stabilized by defendants' conspiracy.

91.     The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships and ease of information sharing.

92.     The LCD Panel industry is highly concentrated and thus conducive to collusion.   Throughout the Conspiracy Period, defendants collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

93.     The LCD industry is characterized by high barriers to entry.  New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements require constant research and development and investment.  Thus, firms cannot enter the market for the production and sale of LCD Panels without an enormous capital investment.

94.     LCD Panels, whether incorporated into mobile wireless handsets or any other LCD Product are manufactured to a specific size, regardless of manufacturer.   The manufacture of standard panel sizes facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices, and thus enables them to enforce their conspiracy.

95.     The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:  the 2001 creation of AU Optronics itself through the merger of Acer Display and Unipac Electronics; the 2002 merger of the LCD Panel operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd., in 2002; the 2004 joint venture for the production of LCD Panels for televisions

by Hitachi, Toshiba, and Matsushita; the 2005 transfer of Fujitsu Limited's LCD Panel business to Sharp; and the 2006 acquisition of Quanta Display by AU Optronics.

96.     Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Using the otherwise legitimate cover of joint ventures, cross-licenses, and other cooperative arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels with the numerous meetings described hereinafter.

97.     There were many opportunities for defendants to discuss and exchange competitively-sensitive information with their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, emails, and instant messages.  Defendants took advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and monitor each other's compliance with their agreement.

## VI.     DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS

98.     During the Conspiracy Period, the United States was the world's largest consumer of LCD Products, and U.S. companies like Motorola, Dell, Apple and HP were among the largest purchasers of LCD Panels.  When defendants conspired to fix in the U.S. the prices of LCD Panels sold to manufacturers of mobile wireless handsets such as Motorola and Nokia, defendants knew that those panels would be incorporated into mobile wireless handsets purchased in the United States by wireless telecommunications providers

1985880v1/011730

such as T-Mobile. REDACTED

REDACTED

99.     Defendants also analyzed how purchases by United States wireless telecommunications providers of mobile wireless handsets would impact the demand for and supply of LCD Panels. REDACTED

REDACTED

Defendants thus knew that their conspiracy to fix the price of LCD Panels would affect wireless telecommunications providers' purchases of mobile wireless handsets in the U.S.

**A.     Defendants Engaged in Bilateral and Multilateral Meetings and Communications With Competitors To Inflate Prices of LCD Panels and LCD Products**

100.    The defendants conspired to raise the prices of LCD Panels sold into the United States.  The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, Taiwan and in California and elsewhere in the United States.  Defendants' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.  Defendants fostered a culture of corruption within their companies whereby employees at every level—from the very top executive all the way to lower-level sales representatives—engaged in frequent and continuous communications with the employees at every level of their competitors.  Defendants' senior executives made

it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment.  The lower-level employees funneled the competitive information up to their superiors who utilized that information—along with the pricing information they, themselves, were able to collect through their own illegal competitor contacts—to set prices for LCD Panels at artificially inflated levels.  The constant communications at all levels allowed defendants to conspire to set average prices across the entire industry.

1.     **Defendants engaged in illegal bilateral and multilateral communications about the pricing of TFT-LCD Panels and STN-LCD Panels**

101.    In the early years of the conspiracy, beginning in at least 1996, representatives of the Japanese-based defendants, such as Sharp and Toshiba, met and agreed to fix the prices for LCD Panels generally, as well as to specific OEMs; they also agreed to limit the amount of LCD Panels each would produce.

102.    REDACTED

103.    Later in 1998, high-level representatives at various LCD manufacturers, including Sharp, Toshiba, Samsung, NEC, LG Electronics, and Mitsubishi, met to discuss projected sales volumes.  REDACTED

The companies agreed that they needed additional meetings to head off the projected higher level of competition between the companies.  REDACTED

REDACTED

104.    Representatives from Samsung, NEC, Sharp, Hitachi, Mitsubishi, and LG met again later in 1998 to again discuss their projected sales plans to limit competition between them. REDACTED

105.    REDACTED

106.    Beginning in 1999, high level representatives of Samsung met with counterparts at LG and other companies to discuss pricing trends and other aspects of the LCD Panel market.

107.    REDACTED

108.   REDACTED

109.   By 2001, Sharp employees were engaging in bilateral discussions with competitors to share price information for both TFT-LCD Panels and STN-LCD Panels used for mobile wireless handset applications.   REDACTED

110.   Other defendants initiated similar discussions regarding the prices of STN-LCD Panels in furtherance of the conspiracy.   REDACTED

111.   REDACTED

112.   REDACTED

REDACTED

113. From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production. The group meetings these defendants participated in were called "Crystal Meetings." Each defendant attended multiple meetings with one or more of the other defendants during this period. The Crystal Meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and in California and elsewhere in the United States on a regular basis throughout this period.

114. The Crystal Meetings were highly organized and followed a set pattern. Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; while those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings. As described below, the conspiracy also included "working level" meetings and communications.

115.    The "CEO" meetings occurred quarterly from approximately 2001 to 2006. The purpose and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to show the participants figures relating to the supply, demand, production, and prices of LCD Panels for the group to review.  Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

116.    The structure of "Commercial" meetings was largely the same as "CEO" meetings.  These meetings took place more frequently than "CEO" meetings and occurred approximately monthly.

117.    During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and thereafter reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels.  Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

118.    During these CEO and Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreement concerning the amounts each would produce.  Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

1985880v1/011730

119.     The agreements reached at the CEO and Commercial meetings included: (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of LCD Panels, such as quality or certain technical specifications; (3) what to tell customers as the reason for price increases; (4) coordinating uniform public statements regarding anticipated supply and demand; (5) exchanging information about fabrication plant utilization and production capacity; (6) reaching out to other competitors to encourage them to abide by the agreed-upon pricing; and (7) maintaining or lowering production capacity.

120.     During these CEO and Commercial meetings, defendants also agreed to conceal the fact and substance of the meetings and, in fact, took various steps to do so.  Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders or even to other employees of defendants not involved in LCD pricing or production.  On at least one occasion, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to that meeting.

121.     During these CEO and Commercial meetings, discussions included large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices.

REDACTED

REDACTED

122. The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the "Working Level" meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing authority, which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO meetings and at the Commercial meetings.

123. During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending these meetings. Certain defendants were "assigned" other defendants not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings. Participants at the Crystal meetings contacted Japanese defendants (such as Sharp and Toshiba) to relay the agreed-upon pricing and production limitations. Some of these meetings and communications took place in the U.S. and specifically targeted U.S. commerce and U.S. OEMs.

124. REDACTED

1   125.   

2

3

4

5   126.

6

7

8

9   127.

10

11

12   •

13

14

15

16

17

18

19

20

21   •

22

23

24

25

26

27

28   AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 43
       Master File No. 07-m-1827 SI / Case No. C 3:11-02591 SI

1985880v1/011730

1   • REDACTED

2

3

4

5

6

7

8

9

10   • REDACTED

11

12

13

14

15

16

17

18

19

20

21   • REDACTED

22

23

24

25   • REDACTED

26

27

28   AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 44
Master File No. 07-m-1827 SI / Case No. C 3:11-02591 SI

1985880v1/011730

1

**REDACTED**

2

3

4

5

6

7

8

9      128.    Defendant AU Optronics participated in multiple CEO, Commercial, and

10   Working Level meetings, as well as bilateral discussions, between at least 2001 and 2006.

11   Additionally, Quanta Display Inc. and Unipac Electronics, which merged with AU

12   Optronics, participated in Working Level meetings.   Through these discussions, AU

13   Optronics agreed on prices and supply levels for LCD Panels and LCD Products.

14

**REDACTED**

15

16

17

18

19      129.    AU Optronics' illegal communications with its competitors concerned large-

20   sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as

21   well as small and medium-sized LCDs used in mobile wireless handsets and similar devices.

22

**REDACTED**

23

24

25

26

27

28

1985880v1/011730

**REDACTED**

130.    Defendant Chi Mei participated in multiple CEO, Commercial, and Working Level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chi Mei agreed on prices and supply levels for LCD Panels and LCD Products.

131.    Defendant Chunghwa participated in multiple CEO, Commercial, and Working Level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chunghwa agreed on prices and supply levels for LCD Panels and LCD Products.

132.    Chunghwa's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices.

**REDACTED**

1   133.   Defendant Epson participated in multiple bilateral meetings or discussions

2   during the Conspiracy Period during which it entered into agreements with other defendants

3   on prices and supply levels for LCD Panels and LCD Products.   REDACTED

4   ███████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████

8   ███████████████████████████████████████████████

9   134.   Epson's illegal communications with its competitors concerned large-sized

10  LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as

11  small and medium-sized LCDs used in mobile wireless handsets and similar devices.

12  Indeed, Epson has admitted that its participation in the LCD price-fixing conspiracy

13  involved TFT-LCDs that it sold to Motorola for mobile wireless handsets.   ████████

14

15                          REDACTED

16  ███████████████████████████████████████████████████████

17  ████████████

18  135.   Defendant HannStar participated in multiple CEO, Commercial, and

19  Working Level meetings, as well as bilateral discussions, between at least 2001 and 2006.

20  Through these discussions, HannStar agreed on prices and supply levels for LCD Panels and

21  LCD Products.

22

23  136.   Defendant Hitachi had multiple bilateral discussions during the Conspiracy

24  Period, and agreed on prices and supply levels for LCD Panels and LCD Products.   ████

25                          REDACTED

26  ███████████████████████████████

27

28

1985880v1/011730

137.     **REDACTED**

**REDACTED**

138.     Hitachi's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices.

**REDACTED**

139.     Defendant LG Display participated in multiple CEO, Commercial, and Working Level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, LG Display agreed on prices and supply levels for LCD Panels and LCD Products.

140.    Defendant Philips participated in the conspiracy by marketing and distributing LCDs manufactured by Royal Philips and its subsidiaries in the United States. Royal Philips ensured that the prices for such LCDs did not undercut the prices established pursuant to the conspiracy with defendants and other co-conspirators. Royal Philips exercised its dominion and control over Philips to make certain that Philips sold LCDs at those established, supracompetitive prices. Philips was an active, knowing participant in the conspiracy and acted as Royal Philips' agent for selling LCDs in the United States at supra-competitive prices.

141.    During the Conspiracy Period, Philips was also continually and intimately involved in the worldwide LCD market, including the manufacturing and selling of small, medium, and large-sized LCDs. Through this involvement, Philips communicated regularly with known conspirators during the Conspiracy Period and discussed pricing, costs, and market trends for LCD Panels and LCD Products. REDACTED

142.    Co-conspirator Royal Philips, who has received Statements of Objections from the European Commission regarding both CRTs and LCDs, participated in the LCD conspiracy directly and through its joint venture, LG Display, which has already pleaded guilty for its participation in the LCD price-fixing conspiracy. REDACTED

Former sales and marketing managers for Royal Philips, such as Bruce Berkoff, acted as a bridge between their former employers and their current employer

LG Display.  These employees held key positions in sales and marketing at LG Display to facilitate the communication and coordination of acts in furtherance of the conspiracy. Royal Philips had motive and opportunity to collude, and did collude, to enhance the effectiveness of the global cartel to fix the prices of LCDs.

143.    Defendant Samsung participated in multiple CEO, Commercial, and Working Level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Samsung agreed on prices and supply levels for LCD Panels and LCD Products.

REDACTED

144.    Samsung's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices.

REDACTED

145.   In addition, throughout the Conspiracy Period, defendant Samsung SDI specifically participated in the conspiracy by marketing and distributing LCDs containing LCD panels manufactured by Samsung Electronics in the United States.   Samsung Electronics ensured that the prices for LCDs did not undercut the pricing agreements that it reached with defendants and their other co-conspirators.  Samsung Electronics exercised its dominion and control over Samsung SDI to make certain that Samsung SDI sold LCDs at prices consistent with agreements reached by Samsung Electronics.  Accordingly, Samsung SDI was an active, knowing participant in the conspiracy and acted as Samsung Electronics' agent for selling LCDs in the United States at supra-competitive prices.

146.   Defendant Sharp participated in multiple group and bilateral meetings during the Conspiracy Period, and agreed on prices and supply levels for LCD Panels and LCD Products.  REDACTED

147.   REDACTED

148.   Sharp's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as

small and medium-sized LCDs used in mobile wireless handsets and similar devices. Indeed, Sharp has admitted that its participation in the LCD price-fixing conspiracy involved LCDs that it sold to Apple for iPod portable music players and Motorola for mobile wireless handsets. REDACTED

149.    Defendant Toshiba participated in bilateral discussions during the Conspiracy Period, and agreed on prices and supply levels for LCD Panels and LCD Products. REDACTED

150.    Toshiba's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices. REDACTED

1   REDACTED

2

3

4

5

6

7

8

9        151.   Co-conspirator Hydis participated in multiple Working Level meetings

10  between at least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a

11  Taiwanese defendant at least as recently as 2005.  Through these discussions, Hydis agreed

12  on prices and supply levels for LCD Panels and LCD Products.

13

14       152.   Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture

15  among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation

16  ("Panasonic"), and one or more of the partners in this joint venture participated in the

17  meetings described above.  As a result, IPS Alpha was represented at those meetings and

18  was a party to the agreements entered into by its joint venture partners at these meetings.  As

19  explained above, the agreements at these meetings included agreements on price ranges and

20  output restrictions.  The joint venture partners had substantial control over IPS Alpha's

21  production levels and the prices of LCD Panels the joint ventures sold both to the joint

22  venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were

23  active, knowing participants in the alleged conspiracy.

24

25       153.   Co-conspirator Mitsubishi Electric Corporation participated in multiple

26  Working Level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac

27

28

Electronics (later AU Optronics).  Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Panels and LCD Products.

154.    Co-conspirator NEC LCD Technologies, Ltd. participated in multiple group meetings and bilateral discussions with companies including Samsung, Toshiba, Hitachi, Sharp, and LG Display beginning as early as 1998. Through these discussions, NEC agreed on prices and supply levels for LCD Panels and LCD Products.

155.    As part of the larger conspiracy to raise the price of LCD Panels, defendants engaged in bilateral communications specifically regarding prices for small LCD Panels used in mobile devices.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to defendants' customers.

156.    Representatives of defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung, Sharp, Toshiba, and other LCD Panel manufacturers engaged in these bilateral communications with the goal of reaching understandings regarding prices for small LCD Panels used in mobile wireless handsets.  As part of these communications, they discussed prices, quantities, and profits on LCD Panels for mobile wireless handsets and agreed to fix the prices of LCD Panels for mobile wireless handsets for Motorola and other customers. These communications began at least as early as 2001 and continued throughout the Conspiracy Period.

### 2.    Defendants engaged in illegal communications about pricing in the U.S.

157.    ████████████████ REDACTED ████████████████

████████████████████████████████████████████

REDACTED

158.   REDACTED

159.   REDACTED

REDACTED

160.    For OEMs in the United States, such as Motorola, SonyEricsson, Palm and other manufacturers of mobile wireless handsets, defendants' U.S. affiliates led the LCD Panel price negotiations with those OEMs.  Pricing directions came from Asia, where the defendants were also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products.  Many of the defendants' conspiracy meetings and conspiracy communications took place in the U.S., involved the U.S. affiliates of the defendants, and directly targeted U.S. import commerce and U.S. OEMs.

**3.    Defendants engaged in illegal communications about pricing with respect to small panels**

161.    As part of the larger conspiracy to raise the price of LCD Panels, defendants engaged in bilateral communications specifically regarding prices for small LCD Panels used in mobile devices.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to defendants' customers.

162.    These bilateral communications between defendants routinely involved LCD Panels used in mobile wireless devices and other handheld products.  Examples include:

1

- REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

- REDACTED

15

16

17

18

19

20

21

- REDACTED

22

23

24

25

26

27

28

1   • **REDACTED**

2

3

4

5   • **REDACTED**

6

7

8

9

10   • **REDACTED**

11

12

13

14

15

16   • **REDACTED**

17

18

19

20

21

22   **B.**   **Defendants' Participation in the Conspiracy in California**

23   163.   Many defendants conducted operations in California throughout the

24   Conspiracy Period, including defendants Samsung, LG, Toshiba, Epson, AU Optronics, Chi

25   Mei, Chunghwa, Tatung, and NexGen Mediatech.   Through their California operations,

26   defendants implemented their price-fixing conspiracy in the United States.   In fact,

27

28   AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 58
Master File No. 07-m-1827 SI / Case No. C 3:11-02591 SI

1985880v1/011730

defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation specifically admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California. Defendants' employees based in California engaged in bilateral and multilateral communications in furtherance of the conspiracy.

164. Defendants also used their California operations to implement their price-fixing agreements in the United States. Through their activities in California, defendants' successfully increased the price of LCD-Panels, including the price of LCD-Panels sold to customers in the U.S. that manufactured mobile wireless handsets, which raised the price of mobile wireless handsets purchased by T-Mobile.

165. REDACTED

166. REDACTED

1

167.     REDACTED

2

3

4

5

6

7

168.     REDACTED

8

9

10

11

12

13

169.     REDACTED

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

REDACTED

2

3    170.                           REDACTED

4

5

6

7

8

9

10

11    171.                          REDACTED

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   REDACTED

2

3   172.   REDACTED

16

17   173.   REDACTED

1

2

**C.**     **Defendants Have Been Charged With and Have Pleaded Guilty to Fixing the Price of LCD Panels and LCD Products Sold in the U.S.**

3

174.    In December 2006, authorities in Japan, South Korea, the European Union,

4

and the United States revealed the existence of a comprehensive investigation into anti-

5

competitive activity among LCD Panel manufacturers.  In a December 11, 2006, filing with

6

the Securities and Exchange Commission, defendant LG Display disclosed for the first time

7

that officials from the Korea Fair Trade Commission and Japan Fair Trade Commission

8

visited the company's Seoul and Tokyo offices and that the United States Department of

9

Justice ("DOJ") had issued a subpoena to its San Jose office.

10

11

175.    On December 12, 2006, news reports indicated that in addition to LG

12

Display, defendants Samsung, Sharp and AU Optronics were also under investigation.

13

176.    At least one defendant has approached the DOJ to enter into a leniency

14

agreement with respect to defendants' conspiracy to fix prices of LCD Panels.  In order to

15

enter into a leniency agreement under the Corporate Leniency Policy of the Department of

16

Justice, this defendant has reported defendants' price-fixing conspiracy to the DOJ and has

17

confessed its own participation in defendants' price-fixing conspiracy.   The DOJ's

18

investigation of the remaining defendants is ongoing and is expected to result in additional

19

20

guilty pleas and criminal fines from the other defendants to this action.  However, a number

21

of defendants and their executives have pleaded guilty to price fixing, as alleged more fully

22

herein.

23

177.    Chi   Mei   Optoelectronics,   defendant   Chimei   Innolux   Corporation's

24

predecessor in interest, has admitted and pleaded guilty to participating in the conspiracy

25

from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide,

26

including the United States and California in particular, and to participating in meetings,

27

28

1985880v1/011730

conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  In connection with its guilty plea, Chi Mei Optoelectronics has agreed to pay a criminal fine of $220 million.

178.    Defendant LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  LG Display also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, reported at the time as the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

179.    Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.  Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon

prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty pleas, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

180.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.  Specifically, Mr. Kwon admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

181.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide, including the United States and California in particular, from December 2001 through December 2005.  Specifically, Mr. Koo has been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan.  Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of

1985880v1/011730

monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and his conspiratorial contacts.

182.    Chunghwa has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.   Chunghwa also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.   In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65 million.

183.    In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin also pleaded guilty to participating in the conspiracy from September 2001 through December 2006.   Specifically, Mr. Liu, Mr. Lee and Mr. Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to

1985880v1/011730

the participation of subordinate employees in the conspiracy. In connection with their guilty plea, Mr. Lin has agreed to serve a 9-month prison term and pay a criminal fine of $50,000; Mr. Liu has agreed to serve a 7-month prison term and pay a criminal fine of $30,000; and Mr. Lee has agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

184. In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December 2001 through December 2005. Specifically, Mr. Lin and Mr. Cheng have been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

185. Defendant Sharp has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Dell from April 2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to Motorola from the fall of 2005 to the middle of 2006 (including panels incorporated into Motorola's Razr handsets), and to participating in bilateral meetings, conversations and communications in Japan and in the United States with unnamed co-conspirators to discuss

the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  Sharp admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  Defendant Sharp participated in multiple Working Level meetings, as well as bilateral discussions with other defendants, during which it discussed and reached agreements with other defendants on prices for LCD Panels during the Conspiracy Period.  During the Conspiracy Period, Motorola was one of T-Mobile's largest suppliers of mobile wireless handsets, and T-Mobile purchased Razr handsets from Motorola.

186.    Defendant Sharp also participated in multiple bilateral discussions with other defendants, including Toshiba and Epson, during the Conspiracy Period.  Through these discussions, Sharp agreed on prices, price increases, production quotas and production limits for LCD Panels.  Because Toshiba and Epson were Sharp's primary competitors in the sale of LCD Panels used in mobile wireless handsets, Sharp knew that it could not have fixed the prices of LCD Panels incorporated into such handsets – as Sharp admitted it did in its guilty plea – unless it reached agreements with Toshiba and Epson to do the same.

187.    Defendant Epson Japan has admitted and pleaded guilty to participating in the conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Motorola (including panels to be incorporated in Motorola's Razr handsets) and agreed to pay a criminal fine of $26 million.  Epson Japan has admitted to participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in meetings, conversations and communications in Japan and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and

1   sales information for the purpose of monitoring and enforcing adherence to the agreed-upon

2   prices.  During the Conspiracy Period, Motorola was one of T-Mobile's largest suppliers of

3   mobile wireless handsets, and T-Mobile purchased Razr handsets from Motorola.

4        188.   Defendant Epson America is a wholly-owned and controlled subsidiary of

5   co-conspirator Epson Japan.  Epson Japan and Epson America, through their agent, were

6   parties to the agreements made at one of the bilateral meetings described above and acted as

7   co-conspirators.  In addition, to the extent Epson America sold or distributed LCD Products,

8   it played a significant role in the conspiracy because defendants wished to ensure that the

9   prices for such products did not undercut the pricing agreements reached at these various

10  meetings.   Thus, Epson America was an active, knowing participant in the alleged

11  conspiracy, and acted as Epson Japan's agent for selling LCD Products in the United States.

12       189.   Defendant Toshiba also participated in the conspiracy by entering into joint

13  ventures and other arrangements to manufacture or source LCD Panels with one or more

14  defendants that attended the Crystal Meetings.   The purpose and effect of these joint

15  ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such

16  panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation

17  of the price-fixing and production-limitation agreements reached at the meetings.  During

18  the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD

19  manufacturers that allowed it to easily communicate and coordinate prices and production

20  levels with other manufacturers as part of the overall conspiracy alleged herein.   For

21  instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture.  In

22  2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which

23  merged their LCD operations.   In April 2002, Toshiba and Matsushita formed a joint

28

1985880v1/011730

venture, Toshiba Mobile Display, f/k/a Toshiba Matsushita Display Technology Co. Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland. The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

190. When T-Mobile refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that they are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate families distributed LCD Panels or LCD Products to direct purchasers, these subsidiaries played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.   Pricing in the LCD Panel Market Indicates Collusion by Defendants

191.   Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion.  Rather, the behavior of this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of stabilizing and raising prices for LCD Panels at supra-competitive levels.

192.   After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends. However, since at least 1996, the LCD Panel market has been characterized by price stability and certain periods of substantial upward pricing trends.

193.   Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market.  In a competitive market, price increases normally occur during shortage periods.  Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

194.   The demand for consumer electronic products and their component parts generally increases over time.  As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.  For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

195.   Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially

1985880v1/011730

high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity. Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD Panels.

196. In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts. Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs. However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity. In fact, defendants had begun stabilizing and raising the prices.

197. LCD Panel prices began to increase in early 1996. Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand. By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

198. Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

199. 1996 also brought the advent of third generation fabs. Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs. LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in

televisions, computer monitors, and laptops. Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly. Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

200. The supra-competitive level of LCD Panel prices during the Conspiracy Period is demonstrated by, *inter alia*, the fact that costs were decreasing. One of the most significant costs in producing an LCD Panel is the cost of its component parts. Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass. During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate. Thus, the margin between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

201. During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased. Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased. This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

202. LCD Panel prices increased by more than 5% in October 2001. These price increases continued until June of 2002.

203. At the time, defendants blamed these price increases on supply shortages. In fact, these price increases were a direct result of defendants' agreement to fix, maintain,

1985880v1/011730

and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement.  When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

204.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency. These decreasing costs should have led to lower prices and competition among defendants. Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits.  For example, defendants AU Optronics Inc., Chimei Innolux Corporation's predecessor in interest, Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc. posted higher pretax profits than expected in the first quarter of 2002.  AU Optronics reported revenue of NT $19.7 billion in the first quarter, with pretax profit reaching about NT $2 billion.  Chi Mei Optoelectronics reported pretax earnings of NT $800 million on revenue of about NT $8.8 billion at the same period.

205.    This increase in prices and revenue was unprecedented.  During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc. (later purchased by AU Optronics)) rose 184% from the same period in 2001.

**E.    The Conspiracy Extended to Earlier LCD Technologies**

206.    During the Conspiracy Period, both TFT-LCD Panels and STN-LCD Panels (such as CSTN-LCD Panels and MSTN-LCD Panels) were used in mobile wireless handsets.  At various points during the Conspiracy Period, TFT-LCD Panels and STN-LCD

Panels were close substitutes for each other, and purchasers of LCD Panels sometimes switched their purchases from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative prices of TFT-LCD Panels and STN-LCD Panels.

207.     Certain defendants, their corporate affiliates, and other members of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels, including defendants Samsung, Sharp and Epson.  The same individuals at the defendants who were engaged in bilateral communications and group meetings regarding TFT-LCD Panel prices also had responsibility for the sale and marketing of, and pricing responsibilities for, STN-LCD Panels.  REDACTED

REDACTED

REDACTED

1.     **Defendants' Bilateral Communications Regarding STN-LCD Panels**

208.     Defendants' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.  Specifically, defendants engaged in bilateral discussions in which they exchanged information about STN-LCD Panel pricing, shipments, and production.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.   The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered defendants' customers for STN-LCD Panels.

209.     REDACTED

REDACTED

REDACTED

REDACTED

210.     REDACTED

211.     REDACTED

212.     REDACTED

213.     REDACTED

1

REDACTED

2

3

4

214.       REDACTED

5

6

7

8

9

10

11

215.       REDACTED

12

13

14

15

16

17

18

216.    Representatives of LG Display also exchanged information with competitors

19

concerning  pricing  for  STN-LCDs  sold  to  Nokia  during  the  Conspiracy  Period.

20

REDACTED

21

22

23

24

25

26

27

28

217. REDACTED

218. REDACTED

219. REDACTED

220. REDACTED

1985880v1/011730

221.    REDACTED

222.    REDACTED

2.    **The Structure of the LCD Panel Market Facilitated the Inflation of Prices of STN-LCD Panels As Well As TFT-LCD Panels**

223.    At certain points during the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels and CSTN-LCD Panels were close substitutes for each other. For example, beginning in 2000, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant quantities for similar uses – i.e., display purposes – in mobile wireless handsets and other LCD Products that included small displays. At other times during the Conspiracy Period, TFT-LCD Panels and CSTN panels were both purchased in significant quantities for use in notebook PCs.

224.    At certain points during the Conspiracy Period, for certain applications in LCD Products, TFT-LCD Panels, CSTN-LCD Panels and MSTN-LCD Panels were close substitutes for each other. At these points during the Conspiracy period, all three panels

were purchased for display applications in mobile wireless handsets and other LCD Products that included small displays.

225. During the Conspiracy Period, purchasers of LCD Panels sometimes switched their purchases from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative prices of TFT-LCD Panels and STN-LCD Panels. **REDACTED**

Because handset manufacturers could and sometimes did switch from TFT-LCD Panels to STN-LCD Panels in response to higher TFT-LCD Panel prices, defendants knew that in order to effectively fix, raise and maintain prices for TFT-LCD prices, as they have admitted, they would also need to fix, raise and maintain prices of STN-LCD panels as well.

**REDACTED**

226. Because TFT-LCD Panels and STN-LCD Panels were close substitutes in certain LCD Products (including mobile wireless handsets), and purchasers of LCD panels switched purchases between the two technologies, from at least 2001 through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very closely, as seen in the chart below:

1
2
3
4
5
6
7
8
9



10   227.   The defendants understood that they could profitably raise prices of STN-

11   LCD Panels in response to increases in TFT-LCD Panel prices.   REDACTED

12
13
14
15

16   228.   REDACTED

17
18
19
20
21
22

23   229.   During the Conspiracy Period, TFT-LCDs and STN-LCDs were also

24   incorporated into single mobile wireless handsets.  Defendants would often sell the TFT-

25   LCD and STN-LCD together and quote one combined price.  Indeed, defendants Epson and

26   Sharp have specifically pleaded guilty to fixing the prices of the TFT-LCDs that were

27

28

combined with STN-LCDs into certain Motorola mobile wireless handsets.  Because mobile wireless handset manufacturers often requested a single price for LCDs that included both a TFT-LCD and STN-LCD, defendants' illegal price-fixing agreements relating to TFT-LCDs inevitably included the prices of STN-LCDs incorporated into the same handsets.

230.    Because TFT-LCD Panels and STN-LCD Panels, including both CSTN-LCD Panels and MSTN-LCD Panels were substitutes in certain LCD Products at certain points during the Conspiracy Period, and because defendants collectively controlled a significant share of the market for LCD panels, both globally and in the United States, defendants had the incentive and ability to inflate the prices of STN-LCD Panels as well as TFT-LCD Panels.  The conspiracy's success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and *vice versa*.

### F.    The Role of Trade Associations During the Conspiracy Period

231.    The LCD industry is served by several major trade associations that put on industry-wide meetings several times a year.  These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for defendants to cooperate and discuss prices.

232.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar belong.  Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry."  TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] Japan and

Korea TFT-LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

233. South Korean manufacturers had similar trade associations during the Conspiracy Period, the Electronic Display Industrial Research Association of Korea ("EDIRAK") and the Korea Display Equipment Material Industry Association ("KODEMIA"). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

234. Japanese manufacturers of LCDs had a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of LCDs. Its members include Sharp, Toshiba, Hitachi, and a Japanese subsidiary of Samsung. Like KODEMIA and TTLA, SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

235. In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major LCD producers. One of these meetings had been known as the SID Symposium but was renamed the "SID International Symposium and Business Conference." SID also put on a long-running conference called the International Display Research Conference.

236.   The 2004 SID International Symposium and Business Conference ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen (currently under indictment), President and CEO of AU Optronics.   This was followed shortly by a presentation entitled "The FPD Capital Equipment Investment Environment," which informed the conference attendees about "investments planned at the major display manufacturers."   Philips Mobile Display's Chief Technology Officer Dr. Johan van de Ven delivered a keynote address.   His speech was followed by a speech by Dong-Hun Lee, ███

██████████████████████ REDACTED ██████████████████████

████████████████████████   A representative of DisplaySearch also spoke about the LCD market.   There were presentations by analysts from iSuppli/Stanford Resources and other industry experts.   This was all followed by a "networking reception – sponsored by LG Display," to which all conference attendees were invited to participate.   In addition to attendees from AU Optronics and LG Display, representatives from both Samsung and Samsung SDI as well as Chunghwa, Epson, Hitachi, Sharp, and Toshiba were in attendance at SID 2004.

237.   SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU Optronics.   This time it was called "2005: Beyond the Crystal Gateway."   A DisplaySearch representative provided "the latest outlook for flat panel displays covering pricing, demand, and supply" and "the cost and margin outlook for key FPDs . . . ."   Again, these discussions about the LCD market were followed by a "networking reception."   Among the attendees at SID 2004 were Bruce Berkoff of LG Display (and former employee of Royal Philips), Jun Souk and Dong-Hun Lee of Samsung, H.B. Chen of AU Optronics, and Joel Pollack of

Sharp. Senior executives from Sharp, Hitachi, and Royal Philips (through Philips Mobile Display) also attended.

238.   The SID 2005 conference was very similar to SID 2004 but was even more blatant in its discussion of the LCD crystal cycle.  Jun H. Souk, Executive Vice President of Samsung, gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows:  "By reviewing what happened during the business up and down cycles of the LCD in the past, we have learned lessons that will reduce the burden in future cycles.  Efforts made in cost reduction, line-investment timing, and new market generation will be described."

239.   SID 2005 provided a prime opportunity for one of the dominant manufacturers to explain to all of its key competitors how to manage supply and maximize "line-investment timing."  Among the attendees at SID 2005 were Bruce Berkoff of LG Display as well as Sang Wan Lee, Jun Souk, and Joe Virginia of Samsung. SID 2005 featured presentations regarding developments in LCD technology by officials from Samsung and Samsung SDI as well as AU Optronics, Sharp, LG Display, and Hitachi.

240.   The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005 in Okinawa, Japan. The initial conference was held from February 27 to March 2, 2005, and the 2006 conference was held from February 28 to March 3, 2006.

241.   At the 2006 GFPC, executives from AU Optronics, Samsung SDI, Royal Philips (through Philips Mobile Display), and Toshiba gave addresses about the flat panel display industry in Taiwan, South Korea, Europe, and Japan, respectively.   Shigeaki

Mizushima of Sharp gave the keynote address, and Mr. Souk of Samsung moderated a panel discussing the expansion of the flat panel display business.

242.    Participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the co-conspirators.  As Dr. Hui Hsiung of AU Optronics (currently under indictment) has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . the GFPC plays a vital part in building those connections and growing our business."

243.    Among the participants at GFPC 2006 were Ho Kyoon Chung of Samsung SDI, Shigaeki Mizushima of Sharp, Yoshihide Fuji and Mitsugi Ogura of Toshiba, Dr. Hui Hsiung of AU Optronics, Harold Hoskens of Royal Philips (through Philips Mobile Display), and Shoichi Iino of Epson.

244.    As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving defendants further opportunities to discuss prices and output.

G.    **Conspiracy's Effect on U.S. Commerce**

245.    Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels to the facilities of foreign manufacturers, including manufacturers of mobile wireless handsets, knowing that they would subsequently be imported into the United States, one of their most important markets and a major source of their revenues.  In this respect, defendants directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of mobile

1    wireless handsets and other LCD Products T-Mobile purchased in the United States.  Such

2    conduct was meant to produce and did in fact produce a substantial effect in the United

3    States in the form of higher prices being paid for such products by U.S. companies like

4

5    T-Mobile.

6         246.    The U.S. LCD market is enormous and was a major focus of the conspiracy.

7    Measured by value, defendants and others shipped during the Conspiracy Period more than

8    400 million LCD Panels, including those incorporated into LCD Products, into the United

9    States for ultimate sale to U.S. consumers.  During the Conspiracy Period, the value of these

10   LCD Panels imported into the United States was in excess of $50 billion.  Defendants

11   shipped millions of LCD Products worth billions of dollars into the United States each year

12   during the Conspiracy Period.  As a result, a substantial portion of defendants' revenues was

13   derived from the U.S. market.  Defendants spent hundreds of millions of dollars on

14   advertising their products in the United States.  Most, if not all, defendants had marketing,

15   sales, and account management teams specifically designated to handle U.S. customer

16   accounts and the U.S. market for LCD Panels and LCD Products.

17

18        247.    Because of the importance of the U.S. market to defendants and their co-

19   conspirators, LCD Panels and LCD Products intended for importation into and ultimate

20   consumption in the United States were a focus of defendants' illegal conduct.   The

21   defendants knowingly and intentionally sent price-fixed LCD Panels and LCD Products into

22   a stream of commerce that led directly into the United States.  Many LCD Panels were

23   intended for incorporation into finished products specifically destined for sale and use in the

24   United States.  Every defendant shipped LCD Panels directly into the United States, and

25   many defendants manufactured LCD Products and sold them in the United States.  This

26

27

28

conduct by defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

248.    When high-level executives based at defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold in the United States.   Moreover, because LCD Panels are – and were throughout the Conspiracy Period – the most expensive and significant component of LCD Products, defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD Products sold in the United States.

249.    In fact, defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States, which they often referred to as "street prices," because defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD Panels.  Defendants used LCD Product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD Panels.

250.    Defendants have acknowledged that their commercial activities involving intentionally sending LCD Panels and LCD Products into the United States impacted American import trade and import commerce.  In a series of complaints filed with the U.S. International Trade Commission over the past few years, defendants Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of . . . LCD devices" by the other (and by other entities on its behalf).  *See In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation

No. 337-TA-631, Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586*); In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

251. Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce. Those defendants have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more of the conspirators to customers in [the Northern District of California]." *See, e.g.*, Case No. 07-01827-SI (D.I. 767-1) (N.D. Cal. Jan. 5, 2009).

252. For the reasons set forth above, defendants' illegal conduct involved import trade or import commerce into the United States, and had a direct, substantial, and reasonably foreseeable effect on U.S. commerce.

## VII.   **PLAINTIFF'S INJURIES**

253. T-Mobile has suffered a direct, substantial, and reasonably foreseeable injury as both a purchaser of mobile wireless handsets containing LCD Panels and as a purchaser of other LCD Products as a result of defendants' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels at supra-competitive levels. Defendants' conspiracy artificially inflated the price of LCD Panels incorporated into such mobile wireless handsets,

causing T-Mobile to pay higher prices than it would have in the absence of defendants' conspiracy.

254.    In some cases, T-Mobile purchased mobile wireless handsets directly from defendants.  For example, during the Conspiracy Period, T-Mobile purchased mobile wireless handsets directly from defendant Samsung, its affiliates, and/or its wholly owned and controlled sales agents in the United States.

255.    T-Mobile purchased certain handsets from Samsung pursuant to a PCS Handset and Accessory Supply Agreement, dated as of September 1, 2001, and amended from time to time ("Samsung Handset Supply Agreement").  Evidencing the substantial volume of business between T-Mobile and Samsung in New York, the Samsung Handset Supply Agreement was governed by New York law, and the parties agreed to a New York venue to resolve disputes under the agreement.

256.    As a result of defendants' conspiracy to fix the price of LCD Panels, T-Mobile purchased mobile "Samsung"-branded wireless handsets from Samsung at artificially-inflated prices and suffered injury in the United States as a direct purchaser from Samsung.

257.    T-Mobile also purchased mobile wireless handsets containing LCD Panels from other handset OEMs, which in turn purchased LCD Panels from defendants and their co- conspirators.  Defendants' conspiracy affected and artificially inflated the price of LCD Panels purchased by these handset OEMs, which paid higher prices for LCD Panels than they would have absent the conspiracy.

258.    The handset OEMs passed on to their customers, including T-Mobile, the overcharges caused by defendants' conspiracy.  T-Mobile was not able to pass on to its

customers the overcharge caused by defendants' conspiracy. Thus, T-Mobile suffered injury when it purchased mobile wireless handsets containing LCD Panels from the handset OEMs.

259. In addition, T-Mobile has suffered a direct, substantial, and reasonably foreseeable injury as a result of defendants' conspiracy to raise, fix, stabilize or maintain the price of LCD Panels resulting from T-Mobile's purchases of LCD Products for its own use. Defendants' conspiracy artificially inflated the price of the LCD Panels purchased by computer OEMs for incorporation into the desktop computer monitors and laptop and notebook computers sold to T-Mobile. The computer OEMs passed on these artificially-inflated prices for LCD Panels to T-Mobile, causing T-Mobile to pay higher prices for the desktop computer monitors and laptop and notebook computers than they would have paid in the absence of the defendants' conspiracy. As a result, T-Mobile was injured in connection with its purchases of LCD Products for its own internal use during the Conspiracy Period.

## VIII. FRAUDULENT CONCEALMENT, EQUITABLE TOLLING, AND CONTINUING TORT DOCTRINE

260. T-Mobile had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. The affirmative acts of defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. The defendants engaged in a secret conspiracy that did not give rise to facts that would put T-Mobile on inquiry notice that there was a conspiracy to fix the prices of LCD Products.

261.    The defendants agreed to keep the Conspiracy, the agreements reached, and the meetings secret.  Participants were instructed to hide the existence of the meetings from others within their own companies and to keep the meeting reports confidential.

262.    The conspirators knew their activities were illegal, and kept their conspiracy communications strictly confidential.  █████████████ REDACTED █████████████

263.    Therefore, the defendants and their co-conspirators kept their conspiracy communications strictly confidential.  ███████████ REDACTED ███████████

**REDACTED**

264.   By its very nature, defendants' price-fixing conspiracy was inherently self-concealing.   As alleged above, defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement. During these meetings, top executives and other officials attending these meetings were instructed on more than one occasion not to disclose the fact of these meetings to outsiders, or even to other employees of defendants not involved in LCD Panel pricing or production. In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

**REDACTED**

265.   **REDACTED**

266.   Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, in approximately the summer of 2006, they discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information.  The meetings were coordinated so that on the same date,

each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other. These Round Robin meetings took place until at least November or December of 2006. The information obtained at these meetings was transmitted up the corporate reporting chain to permit defendants to maintain their price-fixing and production- limitation agreement.

267. In addition, defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

268. There have been a variety of other purportedly market-based explanations for price increases. The first was supply and demand. In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved." Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

269. Another false rationale provided by defendants was undercapitalization. In 1999, Joel Pollack, a marketing manager for Sharp, stated:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry.

270. A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung. He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

271. Increased demand was repeatedly cited by defendants throughout the Conspiracy Period. On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 94
Master File No. 07-m-1827 SI / Case No. C 3:11-02591 SI

Philips was quoted in News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up." Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo of LG Philips stated "[w]e are seeing much stronger demand for large- size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

272.     Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

273.     These explanations were all pretextual and each served to cover up the conspiracy.

274.     T-Mobile did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December of 2006, when the existence of investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy. Because defendants' agreement, understanding and conspiracy were kept secret, T-Mobile was unaware of defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for LCD Products.

275.     As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to T-Mobile's claims.

1985880v1/011730

276.    The statutes of limitations relevant to T-Mobile's claims for both their direct and indirect purchases of price-fixed LCD Products have also been tolled as a result of the criminal informations and guilty pleas entered as a result of the DOJ criminal investigation.

277.    Also as a result of defendants' fraudulent concealment of the Conspiracy, defendants are equitably estopped from asserting statutes of limitations defense, and principles of equitable estoppel toll the statutes of limitations relevant to Plaintiffs claims.

278.    The defendants' ongoing conspiracy and unlawful conduct constitute a continuing tort, and therefore the statute of limitations cannot accrue until the last act of defendants' violative conduct.

279.    The statutes of limitations relevant to T-Mobile's claims for both their direct and indirect purchases of price-fixed LCD Products have also been equitably tolled as a result of the filing of class actions against defendants and their co-conspirators, including, without limitation, the indirect purchaser class action complaint filed in *Audio Video Artistry v. Samsung Elecs. Co. Ltd., et al.*, Case No. 2:06-cv-2848-SHM-dkv (W.D. Tenn.), on December 14, 2006 and transferred to this Court on April 20, 2007 pursuant to an order of the Judicial Panel on Multidistrict Litigation ("JPML"), dated April 17, 2007; the indirect purchaser class action complaint filed in *Minoli, et al. v. LG Philips LCD Co., Ltd., et al.*, No. 06:07-cv-00235-MV-WDS (D.N.M.), on March 9, 2007 and transferred to this Court, effective May 29, 2007, pursuant to an order of the JPML dated May 11, 2007; and the Direct Purchaser Plaintiff's Consolidated Complaint, dated November 5, 2007, the First Amended Direct Purchaser Plaintiffs' Consolidated Complaint, dated December 5, 2008, and the Second Amended Direct Purchaser Plaintiff's Consolidated Complaint, dated March 3, 2009.

## IX.   <u>VIOLATIONS ALLEGED</u>

### <u>First Claim for Relief</u>
### <u>(Violation of Sherman Act Against All Defendants)</u>

280.    T-Mobile incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

281.    Beginning at a time presently unknown to T-Mobile, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to T-Mobile, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

282.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

        a.      To fix, raise, maintain and stabilize the price of LCD Panels;

        b.      To allocate markets for LCD Panels among themselves;

        c.      To submit rigged bids for the award and performance of certain LCD Panels contracts; and

        d.      To allocate among themselves the production of LCD Panels.

283.    The combination and conspiracy alleged herein has had the following effects, among others:

        a.      Price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the United States;

1985880v1/011730

b. Prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

c. Those who purchased LCD Panels produced by defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

284. T-Mobile has been injured in its business and property by being forced to pay more for the mobile wireless handsets and other LCD Products it purchased from defendants and their co-conspirators than it would have paid in the absence of defendants' conspiracy.

285. Defendants and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by T-Mobile and gave rise to T-Mobile's antitrust claims. As a result, T-Mobile suffered injury as a direct, proximate, and reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels and are entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for their purchases of LCD Products containing LCD Panels sold by defendants, their coconspirators, and others.

286. Because defendants all continue to manufacture LCD Panels, the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion, defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines, defendants' conspiracy to fix the price of LCD Panels could be easily repeated and concealed from T-Mobile, T-Mobile faces a serious risk of

1985880v1/011730

future injury, and are thus entitled to an injunction under Section 16 of the Clayton Act, 15

U.S.C. § 26 against all defendants, preventing and restraining the violations alleged herein.

### Second Claim for Relief
### (Violation of State Antitrust and Unfair Competition Laws)

287.    T-Mobile incorporates and realleges, as though fully set forth herein, each

and every allegation set forth in the preceding paragraphs of this Complaint.

288.    By reason of the foregoing, defendants have entered into agreements in

restraint of trade in violation of the "Cartwright Act":

289.    During the Conspiracy Period, T-Mobile conducted a substantial volume of

business in California.   T-Mobile provided wireless communication services and sold

mobile wireless handsets containing LCD Panels to customers in California through its

corporate-owned retail stores, through independent retailers located in California, and

through its website on the Internet.   T-Mobile also provided wireless communication

services and sold mobile wireless handsets directly to business, government and other

customers in California through both its own sales force and independent sales agents.   In

addition, T-Mobile maintained in California inventories of mobile wireless handsets

containing LCD Panels manufactured and sold by defendants, their co-conspirators, and

others, and operated offices and retail stores in California.

290.    As a result of its presence in California and the substantial business it

conducts in California, T-Mobile is entitled to the protection of the laws of California.

291.    Defendants engaged and participated in the conspiracy through their offices

and operations in California.  Defendants LG Display, Chunghwa and Sharp all admitted in

their plea agreements that acts in furtherance of their conspiracy to fix the price of LCD

Panels were carried out in California.   Defendants AU Optronics, Chi Mei, Epson, LG

Display, Samsung and Toshiba all maintained offices in California during the Conspiracy Period. Employees at defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out defendants' anticompetitive agreement to fix the price of LCD Panels. Defendants also participated in the conspiracy in the U.S. through their California offices by providing information obtained through meetings with other defendants to employees in their California offices for those California employees to use in the course of fixing prices in negotiations with U.S. customers, including manufacturers of mobile wireless handsets that were purchased by T-Mobile in the United States. Defendants' conduct within California thus injured T-Mobile both in California and throughout the United States.

292. Beginning at a time presently unknown to T-Mobile, but at least as early as January 1, 1996, and continuing thereafter at least up to and including at least December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720. Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra-competitive levels. Defendants' conduct substantially affected California commerce.

293. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, LCD Panels.

1985880v1/011730

294.    For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.    to fix, raise, maintain and stabilize the price of LCD Panels;

b.    to allocate markets for LCD Panels amongst themselves;

c.    to submit rigged bids for the award and performance of certain LCD Panels contracts; and

d.    to allocate among themselves the production of LCD Panels.

295.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.    price competition in the sale of LCD Panels has been restrained, suppressed and/or eliminated in the State of California;

b.    prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.    those who purchased LCD Panels from defendants, their co-conspirators, and others and LCD Products containing LCD Panels from defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

296.    As a result of the alleged conduct of defendants, T-Mobile paid supra-competitive, artificially inflated prices for the LCD Products it purchased during the Conspiracy Period.

297. As a direct and proximate result of defendants' conduct, T-Mobile has been injured in its business and property by paying more for LCD Products purchased in California from defendants, their coconspirators, and others than they would have paid in the absence of defendants' combination and conspiracy. As a result of defendants' violation of Section 16720 of the California Business and Professions Code, T-Mobile is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

298. By reason of the foregoing, defendants have also engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 et seq.

    a. Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of LCD Panels as described above;

    b. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act;

    c. Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent

independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d.      Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

e.      Defendants' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa and Sharp all admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  Defendants also maintained offices in California where their employees engaged in communications, meetings and other activities in furtherance of defendants' conspiracy;

f.      During the Conspiracy Period, T-Mobile conducted a substantial volume of business in California.   T-Mobile provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in California at its corporate-owned retail stores and through its website on the Internet.  T-Mobile also sold mobile wireless handsets to independent agents and retailers located in California.   T-Mobile also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in California.  In addition, T-Mobile maintained in California inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co- conspirators, and others, and operated offices and retail stores in

California.   As a result of their presence in California and the substantial business they conduct in California, T-Mobile is entitled to the protection of the laws of California; and,

g.    By reason of the foregoing, T-Mobile is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as result of such business acts and practices described above.

299.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New York General Business Law §§ 340 *et seq.*

a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in New York and fixed, raised, maintained and stabilized LCD Panel prices in New York at artificially high, non-competitive levels;

b.    As a result, defendants' conspiracy substantially affected New York commerce;

c.    During the Conspiracy Period, T-Mobile conducted a substantial volume of business in New York.   T-Mobile provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in New York at its corporate-owned retail stores and through its website on the Internet.   T-Mobile sold mobile wireless handsets to independent agents and retailers in New York. T-Mobile provided wireless communication services and sold mobile wireless handsets directly to business, government and other

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 104
Master File No. 07-m-1827 SI / Case No. C 3:11-02591 SI

1985880v1/011730

customers in New York. T-Mobile maintained in New York inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in New York. T-Mobile's contacts with New York were so extensive that its supply agreement with one member of the conspiracy – Samsung – was governed by New York law and the parties agreed to a New York venue to resolve their disputes under the agreement.

d.   As a result of its presence in New York and the substantial business it conducts in New York, T-Mobile is entitled to the protection of the laws of New York; and,

e.   As a direct and proximate result of defendants' conduct, T-Mobile has been injured in its business and property by paying more for LCD Products purchased for sale in New York from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq*.

## X.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, T-Mobile requests that:

A.   The unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be a violation of federal and state law;

B.      T-Mobile recover damages, and that a judgment be entered in favor of T-Mobile against defendants, jointly and severally, in an amount to be trebled;

C.      T-Mobile obtain any penalties, punitive or exemplary damages, or any other monetary or equitable remedies permitted under applicable law;

D.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      T-Mobile be awarded pre- and post-judgment interest;

F.      T-Mobile recover its costs and disbursements of this suit, including attorneys' fees as provided by law; and,

G.      T-Mobile be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

1

## XI. JURY TRIAL DEMAND

2

Pursuant to Federal Rules of Civil Procedure Rule 38(b), T-Mobile demands a trial

3

by jury for all issues so triable.

4

5    Dated: November 7, 2011

6

7

8

9

/s/      Brooke A. M. Taylor
David Orozco (CA Bar No. 220732)
E-Mail: dorozco@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Ste. 950
Los Angeles, CA 90067-6029
Telephone: (310) 310-3100
Facsimile: (310) 789-3150

10

11

12

13

14

15

Parker C. Folse III (*pro hac vice*)
E-Mail: pfolse@susmangodfrey.com
Brooke A. M. Taylor (*pro hac vice*)
E-Mail: btaylor@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Ave, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

16

17

18

19

20

21

22

Edward A. Friedman (*pro hac vice*)
E-Mail: efriedman@fklaw.com
Daniel B. Rapport (*pro hac vice*)
E-Mail: drapport@fklaw.com
Hallie B. Levin (*pro hac vice*)
E-Mail: hlevin@fklaw.com
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

23

***Counsel for T-Mobile USA, Inc.***

24

25

26

27

28

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page 107
Master File No. 07-m-1827 SI / Case No. C 3:11-02591 SI

1985880v1/011730

1

2

## **DECLARATION OF SERVICE**

3

4
I, Brooke A. M. Taylor, declares as follows:

5
I am employed in the County of King, State of Washington.  I am over the age of

6
eighteen years and not a party to this action.  My business address is 1201 Third Avenue,

7
Suite 3800, Seattle, Washington, 98101, in said County and State.  On November 7, 2011, I

8
served the following:

9

10
**T-MOBILE USA'S AMENDED COMPLAINT FOR DAMAGES**
**AND INJUCTIVE RELIEF**

11
To all named consul of record as follows:

12

13

14

15
  **X**          **BY ECF (ELECTRONIC CASE FILING):**  I e-filed the above detailed document(s) utilizing the United States District Court, Northern District of California's mandated ECF (Electronic Case Filing) service on the date noted below.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the documents upon confirmation of e-filing.

16

17
  **X**          **BY ELECTRONIC MAIL:**     I caused said documents to be prepared in portable document format (PDF) for e-mailing and served by electronic mail.

18

19

20
Certify under penalty of  perjury under the laws of the United States that the forgoing is true and correct.

21
Executed on November 7, 2011, at Seattle, Washington.

22

23
By: /s/ Brooke A. M. Taylor

24

25

26

27

28
AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF – Page i
Master File No. 07-m-1827 SI / Case No. C 3:11-02591 SI

1985880v1/011730